IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| REBECCA C. HAMMOND, | CIVIL DIVISION |
| Plaintiff, | Case No. 2:21-cv-430 |
| v. | |
| STRIP DISTRICT MEATS, INC. | |
| Defendant. | |

**COMPLAINT AND JURY DEMAND**

A. *Preliminary Statement*

1. The plaintiff Rebecca C. Hammond brings this action under the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 12101 *et seq.,* to redress violations of her right to be free from employment discrimination and retaliation based upon her disability. Because of the violations described herein, this Court is also empowered to exercise pendant jurisdiction pursuant to the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et seq*. A jury trial is demanded.

B. *Jurisdiction*

2. The jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 12117(a), 28 U.S.C. § 1331 and under the doctrine of pendant jurisdiction.

3. The plaintiff filed a timely charge alleging discrimination with the Equal Employment Opportunity Commission ("EEOC"), docketed at 553-2021-00305. This charge was simultaneously cross-filed with the Pennsylvania Human Relations Commission.

4. The EEOC issued a Notice of Right to Sue dated February 2, 2021.

5. The plaintiff filed this complaint within 90 days of receipt of the Notice of Right to Sue.

C.   *<u>The parties</u>*

6.   The plaintiff is an adult individual who resides at 732 Eathan Avenue, Pittsburgh, PA 15226 (Allegheny County).

7.   The defendant Strip District Meats, Inc. ("SDM" or "the company"), is an entity doing business in the Commonwealth of Pennsylvania, and, specifically, in this district. The defendant has a principal place of business located at 2123 Penn Avenue, Pittsburgh, PA 15222 (Allegheny County).

8.   At all times material, the defendant employed more than fifteen employees.

9.   The defendant was the plaintiff's employer and is an employer within the meaning of the ADA, 42 U.S.C. § 12111(5).

D.   *<u>Factual Background</u>*

10.   The plaintiff worked for SDM as Front End Clerk from August 19, 2020 until November 19, 2020, at which time her employment was terminated.

11.   SDM is a local butcher selling various meat products, including specialty and exotic meats.

12.   The plaintiff's duties included customer service and educating customers regarding the products available.

13.   During her employment, SDM's management considered the plaintiff to be a good and productive employee who consistently met or exceeded expectations. Further, the plaintiff was never "written up" or subjected to any verbal or written discipline regarding the performance of her job or her attendance throughout the course of her employment.

14.   The plaintiff has a disability as defined by the Americans with Disabilities Act ("ADA") and/or was perceived by the employer as having a disability. Specifically, she has

Generalized Anxiety/Panic Disorder, a physical and/or mental impairment that substantially limits one or more of the major life activities of the plaintiff.

15. The plaintiff did not disclose the fact that she had a disability at the beginning of her employment. As detailed below, the plaintiff first disclosed her disability on November 19, 2020.

16. On November 8, 2020, the plaintiff got a Covid test – as a precaution – because she got married in late October and she was with a relatively small number of individuals during the wedding and reception. The plaintiff and all the guests wore masks and followed appropriate social distancing recommendations during the event; however, the plaintiff felt that it would be prudent to get a Covid test just to make sure that she did not contract the virus. SDM's staff was aware that the plaintiff got a Covid test.

17. A couple of days later, the plaintiff started to feel ill while she was at work. She decided to leave early and went to UPMC Shadyside Urgent Care. The plaintiff was advised to get another Covid test and to quarantine pending the results. The fact that the plaintiff was going to take a second test for Covid and would quarantine pending the results was disseminated to SDM's staff without her permission.

18. The plaintiff took the second test on November 12, 2020 and remained off of work until November 17, 2020.

19. On November 17, the plaintiff learned that her second test came back negative (the first test had also come back negative), so she was permitted to return to work the next day.

20. Upon returning to work on November 18, 2020, the plaintiff noticed that her co-workers were treating her differently than they did before she started her quarantine. She felt like they mostly went out of their way to ignore her, and, when they did address her, they did so

curtly, if not rudely. The plaintiff asked one of her co-workers what was wrong, and she verbally attacked the plaintiff, complaining about the fact that the plaintiff had been potentially exposed to Covid twice over a relatively short period of time. She told the plaintiff in an accusatory voice, "You could have infected everyone in the store and closed down all the kitchens in the city." (In addition to its retail business, SDM sells products to restaurants in the city).

21. The plaintiff was stunned by the hostility, and was concerned that everyone else in the store might have felt the same way.

22. That night and the next morning, the plaintiff felt her anxiety starting to increase, but felt that she would be able to "get through it" (prior to this, she did not have any issues with her disability while at work, but the hostility directed to her the day before was triggering). She reported to work as usual and, although she felt anxious, she was able to work the morning portion of her shift.

23. The plaintiff went to her car for her lunch break to eat her meal. While on her lunch break, she suddenly had a series of panic attacks and could not leave her car and return to work at the conclusion of her lunch break.

24. At 2:30 p.m., Bengele, the owner of SDM, sent a text to the plaintiff:

*Um did you quit? Like just leave on your lunch? Everyone is concerned*

25. The plaintiff was still in the throes of the panic attacks and was not able to respond until 3:22 p.m.:

*No. I've been having panic attacks all day. Could someone come out to talk? I'm in the parking lot.*

26. At 3:39 p.m., Bengele responded:

*Becca, I think you need to go home and talk to your husband. Maybe you need to get some help.*

27. The plaintiff sent the following in response:

*Ok. Is there a time I can talk to you about an accommodation for my panic disorder? I want and need to work.*

28. Bengele's following text in response reflects that she did not want to deal with the plaintiff's disability and was attempting to avoid the situation:

*No. I think you need to take some time and figure out some personal things. Maybe then we can talk. Today you walked out, just left and said nothing.*

29. To the extent that Bengele did not fully understand yet that the plaintiff was disclosing the fact that she had a disability and wanted to engage in an interactive process for an accommodation, the plaintiff made it very clear in her next text, sent at 4:05 p.m.:

*This is not related to something happening in my life right now. This is related to my medical diagnosed panic disorder. I am making an attempt to find a reasonable accommodation so that I can give SDM my best work during. Please advise when we can meet and whether you are issuing a schedule change in response to my panic attack. I am happy to have a remote meeting if it is easier.*

Bengele did not respond, so, at 4:27 p.m., the plaintiff sent the following:

*I'm still here if someone wants to meet before the store closes, and can come in before work tomorrow if that helps facilitate a conversation as well.*

30. At 4:47 p.m., Bengele sent the following:

*There is nothing more to say. You walked out*

The plaintiff responded:

*So, what are you saying, exactly?*

*I would like to discuss an accommodation so that this doesn't happen again.*

31. Bengele responded as follows:

*I am saying you walked out on us. I am a small business I don't have the resources to help you. You need to go home and talk to your husband and maybe your doctor*

5

32. The plaintiff did not require "resources" from SDM; she needed the company to engage her in an interactive process and to arrive at a reasonable accommodation. Upon realizing that the plaintiff has a disability, Bengele did not want her around; she was obviously concerned that continuing to employ the plaintiff – because of her disability – would cost her company "resources" or otherwise burden her small business.

33. The plaintiff sent another text, offering to come in the next day to discuss reasonable accommodations. Bengele responded:

*This is my last text. Do not come in tomorrow*

34. A couple of minutes later, the plaintiff again tried to engage Bengele:

*If you need help understanding disability law, please visit pittsburghpa.cov/chr [sic] or eeog.gov [sic]. These both give examples of how to work with employees with disabilities and what parties' responsibilities are.*

Bengele did not respond.

35. On the morning of November 20, 2020, the plaintiff sent another text to Bengele:

*I need to know if I'm still scheduled for work Saturday, or if I'm being terminated because of my panic attack.*

Bengele did not respond.

36. SDM terminated the plaintiff's employment on November 19, 2020.

37. One of the reasons given for the plaintiff's termination was that the plaintiff "walked out". However, this is not the real reason and is instead a pretext to cover up for the fact that the plaintiff was terminated because of her disability. The plaintiff did not "walk out"; she was in her car, located in the parking lot, having panic attacks. Further, other similarly situated employees without disabilities have left during a lunch or other break and did not return in a timely manner – with no legitimate reason – but their employment was not terminated, like the plaintiff.

38. The other reason for the plaintiff's termination was that SDM did not have the "resources" to help her. As detailed above, SDM saw the plaintiff's disability as a potentially expensive burden and was likewise concerned that "helping her" would require significant resources. The plaintiff, however, did not require much; she merely wanted a reasonable accommodation so that she could continue to perform all of the essential function of her job as she had been doing. In any event, refusing to engage in an interactive process with an employee, based on the claim that the employer "lacks resources" to "help her" is discriminatory in itself.

39. Further, the plaintiff was retaliated against for disclosing her disability and requesting a reasonable accommodation.

## **FIRST CAUSE OF ACTION**

40. The preceding paragraphs are incorporated herein by reference as if they were set forth at length.

41. The plaintiff has a disability and thus is protected against discrimination under the ADA.

42. The plaintiff was qualified for her position.

43. The plaintiff was able to perform her position with or without a reasonable accommodation.

44. Despite her qualifications, the plaintiff was terminated. The reasons given for her discharge were a pretext.

45. The defendant's discharge of the plaintiff was because of her disability, in violation of the ADA.

46. Further, the plaintiff was retaliated against for disclosing her disability and requesting a reasonable accommodation.

47. The defendant's violation of the ADA was committed with intentional or reckless disregard for the plaintiff's federally protected right to work in an environment free of discrimination.

## SECOND CAUSE OF ACTION

48. The preceding paragraphs are incorporated herein by reference as if they were fully set forth herein.

49. As a direct and proximate cause of its actions, detailed above, the defendant has violated the plaintiff's right to be free from discrimination and harassment under the Pennsylvania Human Relations Act, 43 Pa. C.S.A. § 951 *et seq.*

WHEREFORE, the plaintiff respectfully requests judgment be entered in her favor and against the defendant and that the defendant be required to provide all appropriate remedies under the ADA and the PHRA, including attorney's fees and costs.

Respectfully submitted,

*/s/ Michael J. Bruzzese*
Michael J. Bruzzese
Pa. I.D. No. 63306

2315 Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219

(412) 281-8676

Counsel for the plaintiff

Dated: April 5, 2021